UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID MARSHALL and
CHANDRA MARSHALL,

        Plaintiffs,

                                      Case No. 08-cv-13257

v.

                                       Paul D. Borman
                                       United States District Judge

CITY OF FARMINGTON HILLS, et al.,

        Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT (ECF NO. 40)

### I. INTRODUCTION

This is a civil rights case filed pursuant to 42 U.S.C. §§ 1983 and 1985 arising from a traffic stop that occurred in December 2006. The Defendants in this matter are Officer Michael Meister, Officer James Jarrett, Sergeant Soderlund, Sergeant William Dwyer, Sergeant Scott Cronin, "Unknown" Farmington Hills Police Supervisors, and the City of Farmington Hills. Plaintiffs are David Marshall and Chandra Marshall.

The complaint in this action was originally filed on July 29, 2008 and an amended complaint was filed on October 20, 2008. (ECF No. 13). Now before the Court is the Defendants' Amended Motion for Summary Judgment originally filed on November 3, 2009. (ECF No. 40). Plaintiff filed a response on December 3, 2009. (ECF No. 44). Thereafter, Defendants filed a reply. (ECF No. 54). After the most recent United States Court of Appeals for the Sixth Circuit's decision in this case, Defendants sought to have the Court address the merits of their previously filed amended summary judgment motion (hereinafter "Renewed

Motion for Summary Judgment") because the Court's previous orders only addressed the issue of collateral estoppel and the validity of a release-dismissal order. The Plaintiffs did not object to the request. (ECF Nos. 70 & 84) . The Court then agreed to revisit the Amended Motion for Summary Judgment, reopened the Motion, and allowed both Plaintiffs and Defendants to file short supplemental briefs regarding any pertinent changes in the law (*see* ECF Nos. 94 & 95).

Oral argument on the renewed motion for summary judgment was held on August 11, 2015. For all the reasons set forth below, the Court will GRANT Defendants' renewed motion for summary judgment.

## II. PROCEDURAL BACKGROUND

On March 1, 2010, this Court granted Defendants' motion for summary judgment and dismissed this action, finding that Plaintiffs were collaterally estopped from bringing the instant claims based on a release-dismissal order entered by a Michigan state court. On May 1, 2012, the United States Court of Appeals for the Sixth Circuit reversed and remanded this Court's March 1, 2010 Amended Opinion and Order, finding that the state court's oral pronouncements were not a valid final order for purposes of collateral estoppel because they were not fully expressed in a written order. *Marshall v. City of Farmington Hills* (*Marshall I*), 479 F. App'x 661 (6th Cir. 2012); (located on the docket at, ECF No. 76). The Sixth Circuit remanded the action to this Court to "evaluate the validity of the release-dismissal agreement".

Thereafter, Defendants filed a "Motion to Dismiss based on a Valid Release-Dismissal Agreement". (ECF No. 79). On May 1, 2013 the Court held a hearing on that motion, during which Defendants produced a signed order from the state court, dated April 3, 2013, and entitled Order Dismissing Case Nos. 06H486832A and 06H486832B and Denying Defendant's Motion

2

for a New Trial.  Then, on July 2, 2013, following the filing of Plaintiffs' supplemental brief, this Court granted Defendants' Motion to Dismiss finding that the release-dismissal agreement was valid on the basis of the state court's written "*nunc pro tunc*" order and held that collateral estoppel applied to bar the present action.  (ECF No. 84).  Plaintiffs appealed that decision. (ECF No. 86).

On August 27, 2014, the Sixth Circuit reversed the finding of this Court and held the release-dismissal was unenforceable under federal law because Defendants could not carry their burden in showing that the release dismissal was entered into voluntarily and that there was no evidence of prosecutorial misconduct.  *Marshall v. City of Farmington Hills* (*Marshall II*), 578 F. App'x 516, 520-23 (6th Cir. 2014) (located on the docket at ECF No. 89).  The Sixth Circuit also held that collateral estoppel did not apply and remanded the action for "proceedings consistent with" the opinion.  *Marshall II*, at 526.  On November 10, 2014, the pertinent mandate issued.

On December 17, 2014, the Court held a status conference and formally reopened the case.  (ECF No. 92).  During the status conference, as noted above, the Defendants requested that the Court revisit their previously filed Motion for Summary Judgment as the Court had only reached the issues of claim preclusion and estoppel but never reached the merits of the claims. The Court agreed and allowed the parties to file short supplementary briefs regarding any updates in the applicable law.  (ECF No. 93).  Thereafter, the parties filed their supplementary briefing.  (ECF Nos. 94, 95).

### III. FACTUAL BACKGROUND

A.      Traffic Stop, Tasering and Arrest

In the early morning hours of December 13, 2006, at 1:05 a.m., Plaintiff Marshall

("Marshall"), a City of Detroit police officer, was driving home from Detroit to his Farmington

Hills residence in his personal vehicle after working the afternoon shift. Marshall was wearing

his Detroit Police Department uniform and was carrying a department-issued duty firearm on his

gun belt.

Meister observed Marshall commit a red light violation while making a left-hand turn at

the intersection of 10 Mile Road and Inkster. (Defs.' Ex. 1, Meister Dep. at 64)[1]. The video

recording reveals that Marshall entered the intersection to make a left-hand turn while the

governing traffic light was still red. (Ex. 5, Squad Car 1:05:38-42). As stated by Meister, "[i]t

basically appeared that [Marshall] was trying to time the light. He pulled forward, and the light

was still red. He entered the intersection and started making a left-hand turn." (Meister Dep. at

64). The opposing light turned green as Marshall was about mid-way through the turn. (Squad

Car 1:05:42).

Meister determined that Marshall had committed a red light violation. (Meister Dep. at

64). Meister followed Marshall for approximately one minute and eventually activated his

overhead emergency lights at 1:06:32.[2] Marshall eventually brought his car to a complete stop

---

[1] Unless otherwise indicated, all exhibits referenced by the Court refer to exhibits
attached to the Defendants' Motion for Summary Judgment.

[2] It appears from the video believe that the "L" displayed in the video to the left of the
date indicates when the emergency lights are turned on. The "L" appears for the first time at

4

on the left side of the street next to his mailbox at 1:06:44.[3]  It therefore took approximately

twelve seconds from the time Meister activated his emergency lights for Marshall to stop his car.

 (Squad Car at 1:06:32-1:06:45).

Meister exited his vehicle and walked up to the driver's door of Marshall's car, at which

point Meister stated: "It's more important picking up the mail than stopping for me."  (Squad

Car 1:07:02-04).  Marshall responded: "Yeah, I'm just pulling in, man."  (*Id* at 1:07:05-06).

Meister cut Marshall off and stated: "Yeah, guess what?  I don't care" and asked again: "Is it

more important for you to pick up your mail than stop for me?"  (*Id*. at 1:07:06-16).  Meister

repeated the same question a second time and stated: "You better put this car in park, mister."

(*Id*. at 1:07:17-19).

Marshall's car then moved forward a few feet while Meister was standing beside the

driver's window.  (*Id*. at 1:07:23-26).  Marshall then stated: "Let me step out so we can have a

conversation."  Meister replied: "We will have a conversation."  (*Id*. at 1:07:27-29).  Meister

asked Marshall: "Are you are somebody special," at which point Marshall voluntarily exited his

vehicle and responded: "No, I'm not somebody special."  (*Id*. at 1:07-28-33).  Meister then

stated: "I'm trying to pull you over" and Marshall asked: "For what?"  (*Id*. at 1:07:32-34).

Meister responded: "For the red light up at Inkster and 10 Mile."  (*Id*. at 1:07:35-37).  The two

then debated whether the light was red or green and Marshall insisted, incorrectly, that it was

green.  (*Id*. at 1:07:37-44).

_____

exactly 1:06:32.

[3] Because Marshall had crossed over to the left side of the two-way street, he alledgely
committed another traffic violation (in addition to the red light violation) – driving on the wrong
side of the road.  (Meister Dep. at 69).

Next, Meister stated: "Gimme some I.D." to which Marshall responded: "Can't you see what I'm wearing?" referring to his police uniform. (Squad Car at 1:07:45-48). Meister then stated: "You gimme some I.D. and some license" and asked again: "You somebody special, huh?" (*Id*. at 1:07:48-54). Marshall responded: "I'm Sergeant Marshall, Detroit Police Department, nice to meet you" and Meister responded in a harsh tone: "I'm Officer Meister, Farmington Hills." (*Id*. 1:07:54-59). Marshall then stated: "You got a problem with me, man?" to which Meister responded, "I want a license." (*Id*. at 1:08:04-05). Marshall stated: "I just got off work and I'm a little tired" and told Meister to "get your supervisor out here." (*Id*. at 1:08:07-12). Meister initially responded, "no," (*id*. at 1:08:12), but, when asked again a moment later, Meister complied with the request and radioed for a supervisor. (*Id*. at 1:08:12-32). While Meister placed the call over his radio to his supervisor, Marshall got back in his car to wait and stated to Meister: "You got a problem with me, man." (Squad Car at 1:08:20-27). After Meister finished radioing for a supervisor, he replied to Marshall: "I have a problem?" (*Id*. at 1:08:24, 1:08: 32-33). The two then debated whether or not Marshall pulled-over in a dilatory manner when Meister activated his overhead lights. (*Id*. at 1:08:37-56).

After the debate, Meister repeatedly ordered Marshall (who at this time was still sitting in his car) to "step out of the car" and Marshall demanded, again, that Meister "get [his] supervisor out here." (*Id*. at 1:08:55-1:09:03).

As Marshall began getting out of his car, Meister also ordered Marshall to surrender his gun and put it on the front seat and repeated the order several times. (*Id*. at 1:09:02-10). Marshall responded: "No I will not." (*Id*. at 1:09:03). After Marshall exited the vehicle, Meister put his right hand on Marshall's left shoulder. (*Id*. at 1:09:05-08). Meister testified that he was

6

going to attempt to pat Marshall down.  (Meister Dep. at 91).  Marshall responded: "Don't put your hands on me, get your hands off me, take your hands off of me, take your hands off of me." (Squad Car. at 1:09:06-13).  Marshall then used his left hand to push back against Meister who is gripping his left shoulder.  (*Id*. at 1:09:09-18).  While Marshall was demanding that Meister remove his hands, Meister stated: "You're gonna make this worse."  (Squad Car at 1:09:11-12). Meister then indicated a willingness to stop touching Marshall if Marshall would surrender his revolver.  (*Id*. at 1:09:16-20).  Marshall refused.  When asked: "Are you going to put your revolver down?" Marshall responded: "No I'm not."  (*Id*. at 1:09:20-22).  Meister and Marshall then released each other.

Shortly thereafter, Meister touched or grabbed Marshall's arm for a second as he stated "You're coming back to my car."  (*Id*. at 1:09:27-32).  Marshall responded: "I'm not coming no where with you.  Don't put your hands on me. You have no reason to put your hands on me." (*Id*. at 1:09:27-32).  The two then debated whether Meister was justified in touching Marshall and whether Meister was justified in ordering Marshall out of his car.  (*Id*. at 1:09:32-1:10:02). Meister asserted that he could "order anyone out of a car" in response to Marshall's repeated questions regarding what reason Meister had in demanding he exit his vehicle.  (*Id*. at 1:09:56).

After the debate, Meister stated: "I'm telling you right now, put your gun on your front seat" and Marshall responded: "No I'm not putting my gun anywhere."  (*Id*. at 1:10:02-05). Meister then told Marshall: "Then go have a seat back in your car."  (*Id*. at 1:10:06-07). Marshall stated that he would do so and said: "You go get your supervisor" to which Meister responded: "Like I'm afraid of you?"  (*Id*. 1:10:08-17).  As Meister walked back to his car, Marshall responded: "I don't want you to be afraid of me, I want you to know your law."  (Squad

7

Car at 1:10:17-19).  Meister then stopped and walked back towards Marshall, who was standing beside the driver's door of his own car.  Meister then stated: "I know my law" and the two engaged in another debate regarding justifications for Meister's actions.  (*Id*. at 1:10:20-46).

While still debating, Meister walked back towards his car and Marshall followed.  (*Id*. at 1:10:38-47).  After walking towards the squad car and out of the view of the camera, Marshall then asked Meister: "Why you touching me?" apparently in reference to what had occurred moments earlier when Marshall had exited his car.  (*Id*. at 1:10:47-49).  Meister answered: "Because you're runnin' your mouth."  (*Id*. at 1:10:49-50).  Meister then stated: "He's not my supervisor," referring to Officer Jarrett, who had just arrived at the scene but is not visible on camera.  (*Id*. at 1:10:51-52).  Jarrett immediately told Marshall that he was "just coming for backup."  (*Id*. at 1:10:53-55).  Marshall stated: "Get your supervisor out here" to which Meister responded: "He's coming."  (*Id*. at 1:10:56-58).

From this point, the remainder of the interaction took place outside the view of the camera, although the audio feed of the video remained available.  Meister then stated: "And you're gonna see something from me, you're gonna see a couple dockets[4] from me."  (Squad Car at 1:10:59-1:11:03).  Marshall responded: "Do what you gotta do."  (*Id*. at 1:11:03-05).  Marshall then stated his plans to pursue charges, and advised Meister that, "You're gonna see some paperwork from me for putting your hands on me."  (*Id*. at 1:11:08-11).

Meister then stated to Marshall: "Again, put that gun down" and Marshall responded: "I'm not putting my gun down.  I'm going to have a seat back in my car."  (*Id*. at 1:11:16-21).

---

[4] Marshall states in his brief that a "docket," as used in this context, is a traffic citation.

Meister interjected: "That does it." (*Id*. at 1:11:19).[5]  While still off camera, the audio clearly reflects the next exchange between Marshall, Meister and Jarrett.  After Meister declared "That does it", Marshall exclaimed: "Don't touch me, you have no reason to touch me . . . don't make me go there, don't make me go there.  You have no reason to touch me." (Squad Car at 1:11:21-30).  Scuffling sounds are apparent. (*Id*. at 1:11:22-28).  At some point during this exchange, Marshall claimed that Meister and Jarrett "attempted to physically seize him and take his service weapon" prior to Jarrett returning to his car for the taser.[6] (Pls.' Resp. at 5).  Marshall then placed his hand on his gun, in his words to "secure it" by "pushing down on it" at the same time Meister reached and grabbed for the weapon and as Jarrett returned from his car with his taser. (Marshall Dep. at 101, 102).

Meister then ordered Marshall to "put your gun on the car" and Marshall responded: "You have no reason to touch me.  I'm not putting my gun on the car." (Squad Car at 1:11:36-40).  At this point, Jarrett interjected: "Taser!" (*Id*. at 1:11:39-40).  Meister then, again, ordered Marshall to surrender his gun and Marshall again refused. (*Id*. at 1:11:41-45).  Marshall then stated "Don't touch me.  Wait for your supervisor to get out here." (*Id*. at 1:11:46-48).  More scuffling sounds can be heard.

---

[5] Meister testified in his deposition that at this point, Marshall "was going to be placed under arrest" for interfering with police authority. (Meister Dep. at 113).  However, Meister never verbalized that he was placing Marshall under arrest or under what charge he would be arresting Marshall. (*Id*. at 112, stating he "didn't get close enough to".).

[6] Meister disputes this timing and testified that Marshall touched his weapon before either he or Jarrett made any physical contact with Marshall. (Meister Dep. at 116).  Jarrett testified that after Meister declared "That does it!", Marshall appeared as though he may draw his weapon. (Jarrett Dep. at 38).  Jarrett later testified that he went to retrieve his taser and when he returned with the taser, Meister and Marshall were physically engaged, but Jarrett did not think Marshall was attacking Meister. (*Id*. at 43, 45-46).

9

Marshall stated repeatedly: "My man, you two are out of control." (*Id*. at 1:11:50-51). Jarrett can then be heard in the background radioing for further backup. (Squad Car at 1:11:51). Meister then advised Marshall: "Sir, guess what?  This is a bad day for you" to which Marshall responded: "No it's not, no it's not.  You are out of control." (*Id*. at 1:12:00-06).  Meister then ordered Marshall to put his hands behind his back.[7] (*Id*. at 1:12:06-07).  Apparent scuffling sounds can be heard and Marshall stated repeatedly: "Stop touching me, stop touching me." (*Id*. at 1:12:10-17).  Then the sound of a single taser discharge can be heard, lasting for approximately four seconds. (*Id*. at 1:12:17-20).  Almost immediately after the sound of the taser, Meister stated: "I got his gun" and Jarrett stated to Marshall: "You're a fool." (*Id*. at 1:12:21-23).  A short time later, Jarrett can be heard stating "Turn around buddy, it's been awhile since you've been tased." (*Id*. at 1:12:40-43).

Marshall was then handcuffed.  Marshall next asked: "Where's your supervisor" and a fourth voice, that of Sergeant Soderlund, can be heard saying: "Right here." (Squad Car at 1:13:37-38).  Marshall then stated: "Sir, we need to talk" and Soderlund responded: "First of all, you're gonna jump in the car and I'm gonna talk to my officers." (*Id*. at 1:13:38-43).  Marshall was then asked twice if he had a second gun on him and Marshall responded: "No I do not." (*Id*. at 1:14:03-11).  A pat down search of Marshall was never conducted. (Meister Dep. at 144).

Meister then recounted his version, of what happened, to Soderlund for approximately four minutes. (Squad Car at 1:14:20-1:18:20).  During his explanation to Soderlund, Meister

---

[7] Jarrett testified during his deposition that he advised Marshall to do what Officer Meister told him to do. (Defs.' Reply, Ex. 2, Jarrett Dep. at 49-50).  When questioned by this instruction was not reflected in the audio recording, Jarrett averred that his instruction may not have been picked up by the video recording because other voices may have been louder than his. (*Id*.).

relayed the facts that Marshall had run a red light, had failed to stop his car right away, and had failed to keep his car in park when Meister approached it.  (*Id*. at 1:15:24).  Meister also told Soderlund that Marshall had "just started mouthin'" (*id*. at 1:15:18-20), that he was "just running his mouth", and that Meister was just trying to talk to Marshall but he is "fuckin' running his mouth" (*id*. at 1:17:05-07).  Meister also explained that he directed Marshall to put his gun down when Marshall "got loud" (*id*. at 1:17:54) and Marshall refused to put down his weapon despite multiple commands to do so (*id*. at 1:15:48).  At one point, when Soderlund asked if Marshall put his hand on his gun, Jarrett interjected: "Several times."  (*Id*. at 1:16:06-07).  Jarrett also told Soderlund that he "drive stunned" Marshall in order to get his gun and noted that Marshall was "an idiot".  (*Id*. at 1:16:12-18).  Soderlund then remarked that Marshall would be arrested for interfering and assault.  (*Id*. at 1:18:17).

Soderlund next talked to Marshall, who recounted his version of what had just occurred. (Squad Car at 1:18:45-1:22:30).  Marshall stated that Meister had pushed on him in an attempt to get him in his patrol car (*id*. at 1:19:35).  Marshall also stated that Meister told him to put down his weapon and he told Meister that he was "not taking my gun" and he had "no reason" to take his gun.  (*Id*. at 1:20:27).  Marshall also admitted that when Jarrett displayed the taser, Marshall "put [his] hand on [his] weapon" because "you're not gonna taser me, you have no reason, you are unjustified."  (*Id*. at 1:20:40-45).

B.      Police Station and Booking

Soderlund stated in his deposition that he "initially believed that [Marshall] should be charged with interfering with a police officer, and . . . possible felonious assault" since Meister and Jarrett stated that Marshall put his hand on his weapon.  (Soderlund Dep. at 61).  However,

11

Lieutenant Anderson, the shift supervisor that night, ultimately decided that Marshall would be charged only with interfering with a police officer.  (*Id*).

Marshall was then taken to the Farmington Hills Police station where he was booked, fingerprinted and photographed.  During the process, Meister ordered Marshall to remove his gun belt pursuant to policy; Marshall told Meister that he could not take off his belt without the removal of his pants.  (Second Booking Video at 2:51:54-2:52:02; Marshall Dep. at 117).[8] Eventually, after stating repeatedly that Meister wanted him to strip, Marshall removed his pants to take off the belt and then put his pants back on.  (Second Booking Video at 2:52:03-2:53:27; Marshall Dep. at 119).  Meister also directed Marshall to remove one of the two t-shirts he was wearing because of policy.  (Second Booking Video at 2:53:30-2:52:51).

During the booking process, but after Marshall removed his belt and one of his t-shirts, Meister was informed by another officer that Marshall would not be placed in the holding cell but rather placed into an interview room.  (Second Booking Video at 3:03:04-12; Meister Dep. at 150).  After being processed, Marshall was released on his own recognizance after a supervisor from the Detroit Police Department arrived.

C.     Child Abuse Charges

In May 2006, some seven months before the incident giving rise to this lawsuit, Marshall was the subject of a child abuse investigation.  The Sixth Circuit succinctly provided the background on this issue in *Marshall II*:

Roughly seven months prior to this incident, Marshall had physically disciplined

---

[8] During oral argument, Defendants supplied the Court with a second version of the Booking Video that contained sound.  The Court relies upon this second version rather than the silent version attached to Defendants' renewed motion for summary judgment as exhibit 5.

his son.  Consequently, the Farmington Hills Police Department undertook an
official inquest into allegations of child abuse.  According to the lead detective on
the case, Stacey Swanderski, the City Attorney failed to contact her, and, as to the
best of her knowledge, the case was closed as of August, 2006.  On December 13,
2006, the same day of Marshall's arrest, Swanderski's supervisor, Scott Cronin,
was contacted by *his* supervisor about the status of the child abuse investigation.
In turn, Cronin contacted Swanderski at home (while she was on medical leave)
to likewise inquire.  The re-initiation of the matter culminated with the
Farmington Hills Police Department's decision to send the misdemeanor child
abuse file to the Oakland County Prosecutor's Office.  That office then charged
Marshall with child abuse on January 5, 2007.

*Marshall II*, 578 F. App'x at 518; (*see also* Pl.'s Resp., Ex. 10, Swanderski Dep. at 26-30

(received call from Cronin on or about December 16, 2006 regarding the status of the case;

believed the case had been previously sent on to the prosecutor's office and closed); Pls.'s Resp.,

Ex. 11, Cronin Dep. at 7-8 (received call from his supervisor asking the status of the child abuse

case on December 13, 2006)).

Marshall contends that the Defendants resurrected these charges in an effort to convince

him not to pursue civil charges against the City and Defendant officers for his treatment during

the traffic stop.  Thereafter, while Marshall's obstruction charge was still pending, Marshall

went to trial on the child abuse charge.  The jury found Marshall not guilty of the charges.

D.      Release-Dismissal

After the not guilty verdict in the child abuse trial, on June 27, 2007, Marshall and the

City of Farmington Hills put a conditional settlement (a "release-dismissal") on the record before

the state court judge presiding over the interfering with an officer case.  (Pls.' Resp. Ex. 7,

6/21/2007 Tr. 3-5).  The City of Farmington Hills agreed that they would dismiss Marshall's

interference charge and Marshall would release the City of Farmington Hills from liability

arising from the traffic stop contingent upon the parties agreeing to the wording of a press

13

release and the terms of the release of civil liability.  (*Id.*).

The parties never agreed upon the wording of the press release and Plaintiff later petitioned the state court for a trial date.  The state court however, determined the case had been settled and denied Plaintiff's request for a trial.  (Ex. 8, 8/14/07 Tr. 6-8; see also Ex. 9, final order dismissing case).  As set forth previously, the Sixth Circuit has determined that the release-dismissal entered in the state court action does not bar this action.

## IV. STANDARD OF REVIEW

Defendants have moved for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure.  This rule provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of genuine issue of material fact." *Id*. at 323; *see also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).  However, in making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

14

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. FED. R. CIV. P. 56(e). The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

The Supreme Court addressed the role of video evidence in the evaluation of a motion for summary judgment in *Scott v. Harris*, 550 U.S. 372 (2007). The Sixth Circuit has recently summarized the implications of that decision:

> *Scott's* holding is twofold. First, *Scott* stands for the proposition that witness accounts seeking to contradict an unambiguous video recording do not create a triable issue. [*Scott*,] at 380-81. Second, *Scott* reaffirmed the holdings of *Matsushita* and *Anderson* that, in disposing of a motion for summary judgment, a court need draw only *reasonable inferences* in favor of the nonmoving party; it need not construe the record "in such a manner that is wholly unsupportable – in the view of any reasonable jury – by the video recording." ... This court has also clarified that there is "nothing in the *Scott* analysis that suggests that it should be restricted to cases involving videotapes." *Coble v. City of Whitehouse, Tenn.*, 634 F.3d 865, 868 (6th Cir. 2011).

*Shreve v. Franklin Cnty, Ohio*, 743 F.3d 126, 132-33 (6th Cir. 2014) (internal citation omitted) (emphasis added); *see also Rudlaff v. Gillispie*, 791 F.3d 638, 639 (6th Cir. 2015) (explaining that where the record includes a police dash-cam video depicting all of the genuinely disputed facts the court must "view[] the facts in the light depicted by the videotape[s]." (citations

15

omitted)).

V. ANALYSIS

The Court notes as an initial matter that Marshall conceded dismissal of a number of his claims at oral argument, specifically: the Equal Protection claim pursuant to 42 U.S.C. § 1983; the Substantive Due Process claim pursuant to 42 U.S.C. § 1983; the Failure to Provide Medical Care claim pursuant to 42 U.S.C § 1983; and the Conspiracy claim pursuant to 42 U.S.C. § 1985. Accordingly, the Court does not address these claims below.

**A.      Title 42 U.S.C. § 1983**

In order to make a claim pursuant to § 1983, a plaintiff must establish a violation of an existing constitutional right by a person acting under color of state law. *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978); *Waters v. City of Morristown*, 242 F.3d 353, 358-59 (6th Cir. 2001). In the present case, it is undisputed that the named Defendant officers were all operating under the color of state law. Therefore, the Court's inquiry concentrates only on whether any actionable constitutional violations occurred.

Defendants also argue that regardless of whether Marshall's constitutional rights were violated, all of the named officers are entitled to qualified immunity. The doctrine of qualified immunity generally protects "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Jones v. Byrnes*, 585 F.3d 971, 974 (6th Cir. 2009). The purpose of qualified immunity is to "shield the official from suit altogether, saving him or her from the burdens of discovery and costs of trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

16

A government official is entitled to qualified immunity "unless a plaintiff pleads facts showing: "(1) that the official violated a statutory or constitutional right and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, --- U.S. ---, 131 S. Ct. 2074, 2080 (2011) (citation omitted). "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, --- U.S. ---, 134 S. Ct. 1861, 1866 (2014). "[I]f genuine issues of material fact exist as to whether the officer[s] committed acts that would violate a clearly established right, then summary judgment is improper." *Bletz v. Gribble*, 641 F.3d 743, 749 (6th Cir. 2011); *see also King v. Taylor*, 694 F.3d 650, 664 (6th Cir. 2012), *cert. denied*, --- U.S. ----, 133 S.Ct. 1473 (2013). This order of inquiry is no longer mandatory; courts are allowed to use their discretion in deciding which of the two steps of the qualified immunity analysis should be addressed first. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Once a government official has raised the defense of qualified immunity, the plaintiff must bear the burden to demonstrate that the defense is unwarranted. *Roth v. Guzman*, 650 F.3d 603, 609 (6th Cir. 2007). A constitutional right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

1. <u>Fourth Amendment</u> - False Arrest (Meister, Jarrett & Soderlund)

      a.     Meister & Jarrett

"[I]n order for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause. Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed."

*Miller v. Saniliac Cnty.*, 606 F.3d 240, 250 (6th Cir. 2010) (quoting *Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir. 2009)).  "Probable cause is assessed from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight and thus, probable cause determinations involve an examination of all the facts and circumstances within an officer's knowledge at the time of an arrest."  *Klein v. Long*, 275 F.2d 544, 550 (6th Cir. 2001) (internal citations and alternations omitted).  Further, "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause."  *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).  Additionally, "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action."  *Id.* (citation omitted).  "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible."  *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000) (citation omitted).

Marshall's claim does not rest upon his initial traffic stop because there is no dispute that Meister pulled Marshall over on a valid and legitimate traffic violation for turning left during a red light.  *See Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (holding "in a traffic-stop setting, the first *Terry*[*v. Ohio*, 392 U.S. 1 (1968)] condition – a lawful investigatory stop – is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation.").  Additionally, Marshall does not claim that Meister lacked the authority to ask him to step out of his vehicle.  *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n. 6 (1977) (*per curiam*) (holding "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth

18

Amendment's proscription of unreasonable searches and seizures."); *see also Arizona*, 555 U.S. at 330-31 (2009) (noting same). Rather, Marshall's false arrest claim is based on the claim that Meister and Jarrett did not have probable cause to arrest Marshall because he "committed no crime in the officers' presence, he was stopped for a minor traffic violation and he complied with all the officers' requests, with the exception of surrendering his weapon (which the officers had no right to request)." (Pls.' Resp. at 13).

Accordingly, the question now before the Court is whether, viewing the facts in a light most favorable to Marshall, the facts and circumstances known to Meister and Jarrett would have warranted a prudent man in believing that a crime had been or was being committed at the time Marshall was physically seized by Meister and Jarrett and placed under arrest.

Here, Marshall was arrested and charged with "Interfering with a police authority" pursuant to Farmington Hills City Ordinance 18-31, which provides: "It shall be unlawful for any person to resist any police officer, any member of the department or any person duly empowered with the police authority while in the lawful discharge of his or her duty, or in any way interfere with or hinder such a person in the discharge of his or her duty." (Defs.' Reply, Ex. 6, City Ordinance; Defs.' Br., Ex. 9, Police Report, at 16). Defendants assert that Marshall violated Ordinance 18-31 because he "argued with Officer Meister, refused to cooperate, refused to obey his lawful commands and refused to relinquish his weapon and place it in his vehicle despite repeated attempts to do so by Officer Meister." (Defs.' Br., at 9-10). As noted above, Marshall contends that he did not violate Ordinance 18-31 because he properly produced his license, requested a supervisor, was attempting to wait for that supervisor, and had complied with all of Meister's requests *except* the request that he surrender his weapon. (Pls.' Resp. at

13).

There is no dispute that Marshall refused to comply with Meister's multiple orders to disarm himself – to separate his pistol from his immediate possession.  During the first instance of Marshall refusing to disarm, Marshall was in his car, his pistol was on his person, and he refused to put the weapon on his seat before getting out of the car at Meister's direction. Thereafter, Meister attempted to turn Marshall around allegedly to pat him down and Marshall resisted by grabbing Meister's arm.  Thus, the two faced off with each other.[9]  Thereafter, Meister directed Marshall (still armed) to proceed to his patrol car; Marshall refused to go to the patrol car.  Meister then ordered Marshall back to his own car.  Rather than go back to his own car, Marshall followed Meister off camera to talk to Jarrett.  Then, Meister repeatedly commands Marshall to disarm and Marshall repeatedly refuses.

Marshall argues generally in his response and supplemental brief that all of Meister's demands that he disarm were "illegal" because Marshall did not pose a threat to Meister and therefore, Meister could not lawfully request that Marshall, who was only pulled over for a traffic violation, disarm.  (Pls.' Supp. Br. at 3).  The Court notes that Marshall has failed to cite any case law wherein an officer's command for a person to disarm during a routine traffic stop was found to be without justification.  In fact, the case Marshall relies upon, *Kelly v. City of Oak Park*, No. 13-10634, 2014 WL 4829601 (E.D. Mich. Sept. 29, 2014), is inapposite to his argument.  In *Kelly*, the plaintiff was pulled over for speeding.  *Id*. at *1.  The officers

---

[9] Marshall does not challenge Meister's attempted frisk of Marshall as unlawful.  *See Arizona*, 555 U.S. at 331 (noting "once outside the stopped vehicle, [a driver] may be patted down for weapons if the officer reasonably concludes that the driver 'might be armed and presently dangerous.'") (citing *Mimms*, 434 U.S. at 112).

approached the vehicle and the plaintiff disclosed that he was carrying a concealed weapon.  *Id*. at *2.  The officers then seized the gun from the front seat of plaintiff's car.  *Id*.  After the seizure of the gun, the officers directed the plaintiff out of the car and ultimately arrested him for resisting because he was not responding to their commands quickly enough.  *Id*. at *4.  In examining the plaintiff's claims for false arrest and excessive force, the court in *Kelly* noted that the immediate seizure of the gun from an individual pulled over for a traffic violation was justified by the "paramount concern of officer safety", but held the mere presence of the gun did not justify a forceful arrest of the individual that takes place *after* the individual is disarmed.  *Id*. Similarly, in the present case, a concern for officer safety would justify a request (and immediate seizure) of a weapon during a traffic stop.  Indeed, the Supreme Court has recognized the importance of officer safety during a traffic stop and explained that: "traffic stops are 'especially fraught with danger to police officers.'  'The risk of harm to both the police and the occupants [of a stopped vehicle] is minimized,' ... 'if the officers routinely exercise unquestioned command of the situation.'" *Arizona*, 555 U.S. at 330 (internal citations omitted).

Here, Marshall ignores the undisputed facts that he was armed, heatedly debating the propriety of his traffic stop with Meister, and had physically engaged with Meister immediately after Meister's first request to disarm.  Ergo, the Court rejects Marshall's argument that Meister's commands were unlawful because Marshall did not pose a present threat to Meister. Given the totality of the circumstances, it would be reasonable for an officer to believe that the presence of a weapon on a suspect during a traffic stop posed an inherent and immediate threat to their safety.

Moreover, in *Kelly*, the district court concluded that there was no justification for arresting the plaintiff for the charge of resisting arrest that predated the actual act of arresting the plaintiff for resisting.  *Id.*, at * 5.  In the present case, Marshall's failure to follow Meister's multiple commands to give up his weapon occurred well before Meister or Jarrett made any attempt to seize or arrest Marshall.  Therefore, the Court finds that Marshall's reliance on *Kelly* is misplaced.

During oral argument, for the first time, Marshall also claimed that he did not violate Farmington Hills Ordinance 18-31 because the Ordinance does not criminalize the failure to follow verbal commands.[10]  Marshall did not set forth any legal analysis to support his argument.

In *King v. Ambs*, 519 F.3d 607 (6th Cir. 2008),  the Sixth Circuit addressed an analogous argument.  In *Ambs*, the plaintiff was arrested after repeated telling a third party he did not have to answer an officer's questions pursuant to local ordinance for disorderly conduct that defined such a person as one who "obstructs, resists, impedes, hinders, or opposes a peace officer in the discharge of his or her duties."  *Id.* at 610 (citation omitted).  The plaintiff contended the local statute did not include verbal resistance and relied upon *People v. Vasquez*, 465 Mich. 83 (2001), wherein the Michigan Supreme Court concluded that the "resisting and obstructing" statute, Mich. Comp. Laws § 749.479, did not include verbal interference - only physical resistance.  *Id.* at 610-11.  The Sixth Circuit differentiated the holding in *Vasquez*, noting that the Michigan State statute regarding resisting and obstructing used words like "wound" "beat" and "assault".  *Ambs*, 519 F.3d at 611.  The local ordinance, on the other hand, only used the words "obstruct,

---

[10] Marshall's counsel averred specifically that the local ordinance did not cover "verbal-failure to follow verbal command[s]".  It bears noting, however, that if Marshall had complied with Meister's orders, his compliance would have been physical, not a verbal response.

resist, impeded, hinder, or oppose" and, as a result, presented a "less apparently physical context in which to interpret the term 'obstruct'". *Id.* (citation and internal marks and alterations omitted). Based on this distinction, the Sixth Circuit concluded that the "physical obstruction limitation" set forth in *Vasquez* might not apply to the local ordinance. *Id.*; *see also Risbridger v. Connelly*, 275 F.3d 575, 569 n. 3 (6th Cir. 2002) (upholding qualified immunity for officers, despite the decision in *Vasquez*, on the basis that "the language of the city's ordinance, which makes it unlawful to assault, obstruct, resist, hinder or oppose an officer, does not as a whole imply that physical interference is requested to establish a violation.").

In the present action, the local ordinance at issue uses the words "resist", "interfere with" or "hinder". These words imply even less of physical context in which to interpret the statute as the words in *Ambs* or *Risbringer*. Accordingly, just as in *Ambs*, the Michigan Supreme Court's decision in *Vasquez* is distinguishable, and the local ordinance appears to include failure to comply with a verbal order. Moreover, "[i]n response to *Vasquez*, the Michigan legislature enacted § 750.81d(a) and amended § 750.479, opting to define the term 'obstruct' as including 'the use or threatened use of physical interference or force *a knowing failure to comply with a lawful command*." *United v. States, Blomquist*, 356 F. App'x 822, 826 (6th Cir. 2009) (citing Mich. Comp. Laws § 750.479(8)(a) (amendment effective May 9, 2002) (emphasis in *Blomquist*)). Therefore, prior to Marshall and Meister's altercation, the Michigan State statute addressed in *Vasquez* and discussed in *Ambs* was amended to specifically include the failure to follow a command. Accordingly, because any argument based on *Vasquez* is of little or no relevance, the Court rejects Marshall's argument that Farmington Hills Ordinance 18-31 does not criminalize a failure to comply with verbal orders.

23

Additionally, even if this Court were to find that Marshall's failure to comply with Meister's verbal commands did not constitute interference or hindering under the statute, qualified immunity would attach to the officer's actions in this case. Indeed, Marshall has failed to set forth any authority or analogous case law that would show that as of 2006 it was clearly established that the local ordinance at issue was construed only to include physical resistance. *See Ambs*, 519 F.3d at 612-13 (holding qualified immunity applied to the arrest in 2003 because "*Vasquez* interpreted a statute other than the local ordinance on which Officer Ambs relied and considered facts that were very different than those actually confronted by Officer Ambs, *Vasquez* could not have clearly established that Officer Ambs' conduct in arresting King for obstruction was without probable cause."). Thus, it would be entirely reasonable for an officer in 2006 to have believed that Farmington Hills Ordnance 18-31 criminalized the failure to comply with an officer's verbal orders.

b.      Soderlund

As an initial matter, it is unclear which specific Defendants Marshall alleges violated his right to be free from false arrest. It appears from the response briefing that the claim is only directed at Defendants Meister and Jarrett as these are the only defendants mentioned by name in the response. To the extent Marshall is asserting that Defendant Soderlund is also liable for this claim, the Court notes that Marshall has failed to address Soderlund's conduct or culpability separately and therefore has failed to rebut qualified immunity. *See Guzman*, 650 F.3d at 609 (holding that once qualified immunity is asserted, it is the plaintiff's burden to show that the officer is not entitled to the defense.). Moreover, from the record, it is clear that Defendant Soderlund arrived at the scene after Marshall was in handcuffs. Defendant Soderlund had only

24

Meister and Jarrett's representations that Marshall refused orders to disarm and had gone for his gun. Significantly, Marshall admitted to Soderlund that Meister told him to give up his gun and he said "no you're not taking my gun" (Squad car at 1:20:24-29) and that Marshall "put [his] hand on [his] weapon" because "you're not gonna taser me, you have no reason, you are unjustified" (Squad Car at 1:20:40-45). Based on those uncontroverted facts, it would be objectively reasonable for Soderlund, who arrived after the altercation, to believe probable cause existed to arrest Marshall for interfering or hindering a police officer. Therefore, Soderlund is entitled to qualified immunity on this claim.

  2.  <u>Excessive Force: battery and tasing (Meister & Jarrett)</u>

 "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Aldini v. Johnson*, 609 F.3d 858, 864 (6th Cir. 2010) (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)). Here, there is no dispute that the pertinent altercation occurred in "the context of an arrest or investigatory stop of a free citizen" and therefore falls under the "Fourth Amendment's prohibition against unreasonable seizures of the person". *Id*. (citation omitted).

 To make a showing of excessive force "[u]nder the Fourth Amendment, [courts] apply an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013) (citing *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004)); *see also Graham*, 490 U.S. at 396-97. There are three factors that guide the Court's analysis in this inquiry: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is

actively resisting arrest or attempting to evade arrest by flight." *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (citing *St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005)); *see Graham*, 490 U.S. at 396. The inquiry must also be "assessed from the perspective of a reasonable officer on the scene making a split-second judgment under tense, uncertain, and rapidly evolving circumstances without the advantage of 20/20 hindsight." *Burgess*, at 473 (citing *Graham*, 490 U.S. at 396-97); *accord Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002). Further, the court must balance "the nature and quality of the intrusion on [a plaintiff's] Fourth Amendment interests against the countervailing governmental interests at stake." *Ciminillo v. Streicher*, 434 F.3d 461, 466-67 (6th Cir. 2006).

Where more than one officer is alleged to have violated a plaintiff's Fourth Amendment rights, each officer's conduct must be analyzed separately. *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) ("Each defendant's liability must be assessed individually based on his own actions.") (citation omitted). "To hold an officer liable for the use of excessive force, a plaintiff must prove that the officer '(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force.'" *Id*. (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). The Sixth Circuit has stated that generally, an officer's mere presence during an altercation "without a showing of some responsibility, cannot suffice to subject them to liability." *Burgess*, 735 F.3d at 475.

Marshall appears to argue that Meister and Jarrett used excessive force in two instances (Pls.' Supp. Br. at 3). First, Marshall asserts that he was "illegally battered" when Meister initially grabbed him in an attempt to forcibly remove his duty weapon, and then again when

26

Jarrett administered the taser.  (*Id.*).  "A reviewing court analyzes the subject event in segments when assessing the reasonableness of a police officer's actions."  *Morrison v. Board of Trustees of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009) (citing *Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002).  However, in this action it appears that both "segments" – Meister's initial struggle for Marshall's weapon and Jarrett's use of the taser – occurred very close in time or almost simultaneously.  Additionally, neither party addresses the actions separately and accordingly, the Court addresses Meister's and Jarret's actions together.[11]

_____

[11] The Court notes that Marshall's briefing is ambiguous regarding what exact interactions constitute the basis for his claims of excessive force.  In light of the allegations in Marshall's complaint, oral argument, and the briefing submitted to this Court, the Court assumes that Marshall is referring to when he and Meister scuffle off camera just prior to when Jarrett applies his taser.  (*See* Compl. ¶¶ 38-40, 73 ("Meister then shoved Mr. Marshall, pushed him back onto the patrol vehicle and forcibly held him here.  While Meister held Mr. Marshall against the car, Jarrett stepped in and activated the TASER...").

To the extent that Marshall is, in fact, attempting to claim that the earlier interaction between Marshall and Meister that occurred after Meister instructed Meister to exit his vehicle constituted excessive force, the Court finds Meister would be entitled to qualified immunity for the shoulder grabbing or touching.  The video evidence in the record clearly depicts that Meister told Marshall to exit the vehicle and place his gun on the seat.  Marshall exited the vehicle but refused to disarm.  Then, upon exiting the vehicle, Meister touched or grabbed Marshall on his shoulder in an alleged effort to turn him around to conduct a pat down.  Marshall, in response, grabbed Meister by the arm and the two faced off while holding on to one another for a few seconds.  (*See* In Car Camera at 1:09:10-14).  Meister continued to demand that Marshall take off his gun while Marshall responded: "Don't put your hands on me, get your hands off me, take your hands off of me, take your hands off of me."  (*Id.* at 1:09:06-13).  Thereafter, Marshall and Meister released each other and Meister ordered Marshall back to his patrol car, and at the same time Meister touched Marshall's arm for approximately two seconds  (*Id.* at 1:09:27-28).

Marshall has failed to separately address this interaction between Marshall and Meister or offer any case law or analysis that would support an argument that such a touching is anything other than *de minimis* force.  "The relevant inquiry is 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  *Saucier*, 533 U.S. at 202.  Here, even if Marshall could have shown a clearly established right that was violated (he has not), Meister's actions were not unreasonable in light of the situation he faced.  Specifically, that Marshall was armed and refused to take off his gun despite repeated demands.  No reasonable officer would believe that briefly touching an armed suspect (whether an off duty police officer or otherwise) when attempting to turn them around for a pat down, or to take a loaded weapon

27

Here, Marshall was not pulled over in relation to a violent or serious crime and was not attempting to flee the scene.  However, Marshall was armed and had refused multiple orders from Meister to disarm himself.  Jarrett, who arrived at the scene later than Meister, witnessed at least one demand from Meister for Marshall to give up his service weapon and at least one refusal.  After refusing to give up his weapon, Marshall admitted that Meister and Jarrett moved towards him and Meister "attempted" to "illegally seize his sidearm" and in response, Marshall placed his hand on his gun and pushed down on it to secure it.  (Pls.' Supp. Br. at 5; Marshall Dep. at 101-02).  Marshall testified specifically that he put his hand on his weapon "[a]t the point where [Meister] reached and got – attempted to reach and grab for me and then as – as the other officer was coming back with the Taser."  (Marshall Dep. at 101:12-14).  Meister and Jarrett both testified that Marshall put his hand on his gun and that Marshall assumed an offensive posture and "squared off" as though preparing to pull his weapon.  (*See* Jarrett Dep. at 38; Meister Dep. at 112, 115).  At some point, Marshall was physically engaged by Meister who entered into a "hand-to-hand struggle to gain possession of Marshall's service weapon".  (Pls.' Resp. at 11).  Jarrett applied his taser once in drive stun mode to Marshall's groin area for

_____

off their person, or to direct them to a patrol vehicle would violate the suspect's clearly established constitutional rights.  Additionally, the Court notes that Meister's attempt to move Marshall towards his patrol car was immediately after Marshall *grabbed* him.  This physical grabbing by the suspect during a traffic stop further supports Meister's use of limited physical force against Marshall to move him to a patrol car.

Accordingly, the Court finds that Meister's actions in touching Marshall both initially and in an effort to direct him to a police car, that lasted no more than one or seconds, were not unreasonable and therefore Meister is entitled to qualified immunity.

28

approximately four seconds while Meister physically disarmed Marshall.[12]  There is no

allegation from Marshall that Meister or Jarrett used the taser on Marshall after he was disarmed

and handcuffed.

      Given this factual record, the Court concludes that Meister and Jarrett did not violate

Marshall's Fourth Amendment rights when they used physical force and a single taser to disarm

him and effect an arrest.  While the Court must assume Marshall's version of the events – that he

had the intent to "secure" his weapon and keep it from what he believed was an illegal seizure of

the weapon – the Court must also "view his actions *objectively*, from the perspective of a

reasonable officer at the scene."  *Rudlaff*, 791 F.3d. 638, 642 (6th Cir. 2015) (citation omitted).

From such a perspective, it is clear that Marshall was pulled over for a traffic violation, had

refused to give up his service weapon after being instructed to disarm no less than three times,

and had previously grabbed Meister, and prior to being tased, placed his hand on his weapon.

(Marshall Dep. at 101).  These facts are not disputed.  A reasonable police officer observing this

action "in the heat of the moment" did not need to wait to see if Marshall would draw his

---

[12] The Court notes that the exact time-line of this exchange is unclear from the Squad car camera which only provides audio for the pertinent time period.  Further, Plaintiffs' briefing fails to set forth the sequence of events in any clear fashion and contains no deposition testimony (or any other admissible evidence) to support his version of the facts.  Indeed, the portion of Marshall's deposition supplied to the Court fails to provide any details beyond the fact that Marshall grabbed for his gun after Meister made a grab for Marshall's gun and while Jarrett was returning from his car with the taser.

      Additionally, the attached portion of Marshall's deposition fails to detail when and how Jarrett and Marshall approached Marshall or how (or many times) the taser was applied.  Marshall claims in his brief, without any citation or support, that the taser was applied three times.  The Court finds that Jarrett's taser was applied only one time as Marshall has failed to offer any evidence that the taser was used three times beyond alleging it in his complaint and briefing.  Further, the audio of the dashboard camera clearly reflects the sound of one four second long taser use.

weapon before attempting to disarm him physically and using a single tase. *Rudlaff*, 791 F.3d at 642. Indeed, the governmental interest in disarming a man who is armed and placing his hand on his weapon after repeatedly refusing to take off his firearm, clearly outweighs an individual's right to be free from a single "drive-stun" from a taser to effect the disarming and/or a brief physical grabbing or scuffle to gain control of a weapon.

Marshall's reliance on this Court's decision in *Lucier v. City of Ecorse*, No. 12-12110, 2014 WL 1260651 (E.D. Mich. Mar. 27, 2014), *aff'd* 601 F. App'x 372 (6th Cir. Feb. 10, 2015), or *Kelly*, No. 13-10634, 2014 WL 4829601, is misplaced and unpersuasive. (*See* Pls.' Supp. Br.). In *Kelly*, as examined *infra*, the plaintiff was pulled over for speeding and immediately notified the officers he was carrying a concealed weapon, which he voluntarily placed on the passenger seat while still sitting in his car. *Kelly*, No. 13-10634, 2014 WL 4829601, at *1. An officer then took the gun from the seat. *Id*. After taking possession of the gun, the defendant officers proceeded to physically pull plaintiff from his car under the auspices that the plaintiff was not complying with the officers' commands. *Id*. Three officers ultimately took the plaintiff to the ground in a "dog pile" while the fourth officer tased him. *Id.* at *2. In *Kelly*, the court concluded that there were questions of fact regarding whether probable cause existed to arrest the plaintiff for obstruction and resisting and whether excessive force was used to effect the arrest when "nothing in the evidence show[ed] that Plaintiff presented a threat to the Officers" and plaintiff offered no resistance until after he was physically hauled out of the car and the scuffle began. *Id*. at *4, *5-6. Similarly, in *Lucier*, this Court found, and the Sixth Circuit later affirmed, that a reasonable jury could conclude that the use of a taser on a plaintiff who was "standing behind his drum set, not moving in any direction and not attempting to flee" was

30

unconstitutional force and such a right was clearly established as of 2010. *Lucier*, No. 12-12110, 2014 WL 1260651, at *12.

Critically in both *Kelly* and *Lucier*, the plaintiffs did not pose an immediate threat to the defendant officers and in both cases during the altercation *neither individual was armed with a gun*. In *Kelly*, the plaintiff had been disarmed and whether he was physically compliant was an issue of fact. In *Lucier*, taking the facts in a light most favorable to plaintiff, he was unmoving and unarmed. That conduct stands in stark contrast with Marshall who, not only was carrying a loaded weapon, but repeatedly refused to disarm and had previously physically engaged Meister prior to the physical struggle for control of the weapon with Meister. Moreover, Marshall admitted that he placed his hand on his weapon prior to Jarrett's single four second deployment of his taser. *See Correa v. Simone*, 528 F. App'x 531, 534 (6th Cir. 2013) (holding that the use of a taser against the plaintiff was excessive because "Correa did not pose an immediate threat to the safety of the officer or others because, while he allegedly had a gun, at the time Simone used the taser, Correa's hands were in the air and he was not resisting." (emphasis added)); *Kijowski v. City of Niles*, 372 F. App'x 595, 600 (6th Cir. 2010) (holding that "[a]bsent some compelling justification – such as the potential escape of a dangerous criminal or the threat of immediate harm – the use of such a weapon on a non-resistant person is unreasonable." (emphasis added)); *see also Gaddis ex rel. Gaddis v. Gaddis Redford Twp.*, 64 F.3d 763 (6th Cir. 2004) (noting that "[a]s a general matter, this court has expressed doubt "that the use of non-lethal force against an armed and volatile suspect constitutes excessive force.") (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 508 (6th Cir. 2002)). Further, there is no claim and no evidenced in this record that Marshall ever took his hand *off his weapon* when he saw Jarrett had retrieved his taser.

31

Given these circumstances and *undisputed* facts, Marshall's attempt to cast the tasing as unjustified does not succeed. Marshall's argument that Meister and Jarrett's use of force was excessive because he was not forewarned he was under arrest or that his arrest was without probable cause is without any citation to case law or analysis. Further, the argument ignores the facts of this case: Meister and Jarrett were confronted with an armed man who refused to disarm despite repeated requests, had previously grabbed Meister when he had attempted to pat him down or disarm him, and ultimately placed his hand on his weapon, and therefore objectively posed an immediate threat to their safety. In such circumstances, physically grabbing Marshall and attempting to disarm him and administering one tase to disarm him was reasonable. Indeed, Marshall has presented this Court with no authority indicating that a brief physical struggle or the single use of a taser on an <u>armed</u> individual who refused to remove his weapon and then placed his hand on the weapon would ever constitute excessive force.

Oddly, Marshall appears to argue that Marshall's failure to disarm and the placement of his hand on his weapon did not subjectively make Meister and Jarrett fear for their safety because in response, Meister froze rather than draw his weapon and Jarrett retrieved and used his taser rather than draw his weapon and/or shoot at Marshall. (*See* Pls.' Resp. at 11). Marshall's argument not only ignores the objective standard that the Court must use in evaluating whether the defendant officers used excessive force but appears to give away his case: Marshall admits that the officers would have been justified in *drawing their weapons* in response to his actions.

Given all these facts, the Court finds that Marshall cannot establish a constitutional violation occurred and accordingly Meister and Jarrett are entitled to qualified immunity.

32

3. <u>First Amendment Retaliation</u> (Am. Compl. ¶ 91) (Meister & Jarrett)

Marshall also sets forth a claim of First Amendment Retaliation based on Meister and

Jarret's "treatment" of him, namely using excessive force and arresting him.  (*See* Pls.' Resp. at

13).  The Sixth Circuit has explained:

> A retaliation claim essentially entails three elements: (1) the plaintiff engaged in
> protected conduct; (2) an adverse action was taken against the plaintiff that would
> deter a person of ordinary firmness from continuing to engage in that conduct;
> and (3) there is a casual connection between elements one and two – that is, the
> adverse action was motivated at least in part by the plaintiff's protected conduct.

*Kennedy v. City of Villa Hills, Ky.*, 635 F.3d 210, 217-18 (6th Cir. 2011) (*quoting Thaddeus-X v.*

*Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (*en banc*)).

"A 'motivating factor' is essentially [a] but-for cause..."  *Leonard v. Robinson*, 477 F.3d

347, 355 (6th Cir. 2007).  The Court notes that "[b]ecause direct evidence of motive is difficult

to produce, 'claims involving proof of a defendant's intent seldom lend themselves to summary

disposition' and 'circumstantial evidence may provide sufficient evidence of retaliatory intent to

survive summary judgment.'"  *Kennedy*, 635 F.3d at 218 (citation omitted).  Once the plaintiff

"raises an inference that the defendant's conduct was motivated in part by plaintiff's protected

activity, the burden shifts" to the defendant to show that he "would have taken the same action in

the absence of the protected activity."  *Id.* (citing *Bio-Ethical Reform, Inc. v. City of Springboro*,

477 F.3d 807, 821 (6th Cir. 2007)).

The Sixth Circuit also requires that a plaintiff must prove one additional requirement: a

lack of probable cause.  In *Hartman v. Moore*, 547 U.S. 250 (2006), the Supreme Court held that

evidencing a lack of probable cause is an element of a malicious prosecution claim asserted

under *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971).  *Id.* at 265.  The

Sixth Circuit later recognized that *Hartman* called into question its line of cases "holding that 'probable cause is not determinative of the [First Amendment] constitutional question.'" *Leonard*, 477 F.3d at 355 (citing *Greene*, 310 F.3d at 895)).  However, the Sixth Circuit in both *Leonard* and subsequently in *Kennedy*, declined to decide the issue of "whether *Hartman* adds another element to every First Amendment claim brought pursuant to § 1983" because in both cases the Sixth Circuit determined that taking the facts in the light most favorable to the plaintiffs, there was a lack of probable cause.  *Leonard*, 477 F.3d at 355-56; *Kennedy*, 635 F.3d at 217 n. 4.  However, in *Marcilis v. Twp. of Redford*, 693 F.3d 589, 604 (6th Cir. 2012), the Sixth Circuit concluded that a plaintiff's First Amendment retaliation claim that was based on an arrest and later prosecution failed because, just like the plaintiff's similarly asserted false arrest and malicious prosecution claims, "[w]here there is probable cause to file a criminal complaint, a plaintiff will be unable to prevail on [a] retaliation claim.".  *Id*. at 604-05 (citing *Hartman*, 547 U.S. at 265-66); *see also Hightower v. City of Columbus*, 2013 WL 5963215, at * 7 (S.D. Ohio, Nov. 7, 2013); *but cf. Somers v. Charter Twp. of Clayton Police Dept*., No. 10-11123, 2014 WL 897353, at *7-8 (E.D. Mich. Mar. 6, 2014) (finding issue not yet settled).

In the instant case, Marshall claims he was asserting his right to question and criticize police action as guaranteed by the First Amendment and was arrested for his conduct. Defendants argue that they are entitled to summary judgment because Marshall fails to establish that his speech was protected and appears to argue that any protected speech he may have uttered was criminalized by the "properly tailored statute" ordinance 18-31 for which he was arrested.[13]

---

[13] Defendants' argument that Marshall needed to challenge the ordinance under which he was actually arrested as overly broad is off the mark.  *See Sandul v. Larion*, 119 F.3d 1250 (6th Cir. 1997) (holding that "a plaintiff's failure to challenge the relevant Livonia ordinances [did]

Defendants also argue that Marshall's claim fails because probable cause existed for his arrest for hindering and obstructing a police officer. Marshall, on the other hand, only argues that Meister's comments that Marshall was "running his mouth" evidence that his Meister and Jarrett's treatment of him was motivated by his protected speech. (Pls.' Resp. at 13).

The Court finds that Marshall's First Amendment retaliation claim is barred because, as examined *infra*, there was probable cause for Marshall's arrest under the local statute. Accordingly, just as in *Marcilis*, where there was probable cause for Marshall's arrest, he cannot sustain his First Amendment retaliation claim. *Marcilis*, 693 F.3d at 604.

4. Failure to Train, Failure to Supervise Liability and Acquiescence

For a municipality to be liable for a constitutional violation under § 1983, the violation must be a result of a policy or custom of the city. *Monell v. Dept. of Social Services*, 436 U.S. 658, 694 (1978). "That is to say, the liability of counties and other local governments under § 1983 depends solely on whether the plaintiff's constitutional rights have been violated as a result of a 'policy' or 'custom' attributable to the county or local government." *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000). There are four general paths a plaintiff may take to "prove the existence of a municipality's illegal policy or custom. The plaintiff can look to (1) the municipality's legislative enactments or official agency polices; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a

---

not obliterate his inalienable First Amendment rights. Sandul's First Amendment rights [were] guaranteed, absolute, and protected unless his speech falls within an exception"). Additionally, the instant case is not one in which the arrest is premised solely on Marshall's speech, rather Defendants ostensibly and allegedly arrested Marshall for hindering and obstructing a police officer based on his repeated refusals to relinquish his weapon. Marshall maintains, however, that this arrest was *actually* motivated by his earlier comments and criticisms and "running his mouth" prior to the issue with the service weapon.

custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citations omitted).

In the present action, Marshall has asserted claims against the Defendant City and Defendant Dwyer (in his official capacity) based on failure to train and supervise as well as a claim against Defendant Dwyer (in what the Court assumes is his individual capacity) and perhaps other unknown supervisors for acquiescence or failing to supervise. The Court addresses each in turn.

a. Failure to Train (City of Farmington Hills and Dwyer, in his official capacity)

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for the purposes of § 1983." *Connick v. Thompson*, 131 S.Ct. 1350, 1358 (2011). The Supreme Court has observed that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* (citation omitted). Accordingly, the standard for such a finding is high, and "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming to be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989).

The Sixth Circuit has held that a municipality can be liable under § 1983 for a failure to train if a plaintiff can prove three elements: (1) "that a training program is inadequate to the tasks that the officers must perform; (2) that the inadequacy is a result of the [municipality's] deliberate indifference; and (3) that the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury." *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (citation and

internal quotation marks removed).

Marshall appears to contend generally that Meister and Jarrett were not properly trained as police officers by relying on deposition testimony from both defendant officers in which they purportedly admit: they were not trained to know the difference between special orders and general orders (Meister Dep. at 36); were untrained as to knowledge of a citizen's complaint policy (*id*. at 39; Jarrett Dep. at 14-15); that they were unaware of a policy regarding what to do if a motorist requested a supervisor during a traffic stop (Meister Dep. at 86-88; Jarrett Dep. at 62); and were unaware of whether an officer could demand an off duty police officer surrender his weapon during a traffic stop (Meister Dep. at 94). Marshall also notes that Jarrett testified that he was not regularly evaluated regarding his proficiency in departmental policies (Jarrett Dep. at 14).[14]

This evidence is insufficient to show that there was an inadequacy in the Defendant City's training of Meister or Jarrett. Defendants have produced records of the department training summaries for both Meister and Jarrett as well as produced the polices, rules, and regulations of the Farmington Hills Police Department. (Defs.' Reply, Ex. 14). Marshall has not contradicted these records nor identified any particular deficiency in the training of Meister and Jarrett. Rather, Plaintiffs rely only upon cherry-picked portions of Jarrett and Meister's testimony regarding their training on issues of questionable relevance. For example, Marshall

---

[14] Marshall insinuates that Jarrett was not trained regarding the effect of tasers. (Pls.' Resp. at 17, citing Jarrett Dep. at 66). However, Jarrett's testimony is clear that he had formal training on the use of a taser (Jarrett Dep. at 65), that the in-house training lasted a number of hours, consisted of the operation of the taser, and that some officers volunteered to be tased themselves. (*Id*. at 66). Jarrett did note in his testimony that he did not know the "physiological aspects" of taser use, but that he was trained in how exactly the taser worked. (*Id*.).

37

contends that Jarrett and Meister were not trained in citizen's complaints but omits the fact both defendant officers testified they received that written procedure. (Meister Dep. at 39; Jarrett Dep. at 14-15). The record is clear, however, that both Jarrett and Meister had been long time police officers (their training logs date back to 1985 and 1991, respectively) who underwent mandatory 40 hour training every year. (*See* training logs); *see also Harvey v. Campbell Cnty.*, *Tenn.*, 453 F. App'x 557, 566-67 (6th Cir. 2011) (finding that plaintiffs had not produced sufficient evidence of inadequate training of officer when they failed to challenge records indicating the officer's training and significant experience and the officer had actually received the use of deadly force policy).

Even if this limited testimony could establish that Defendants Meister and Jarrett were inadequately trained in general, Marshall has still failed to establish the second element of his claim: that such inadequacy was due to the Defendant City's deliberate indifference. It is well established that the fact a particular officer is "unsatisfactorily trained will not alone suffice to fasten liability on the city". *Harris*, 489 U.S. at 390-91 (citation omitted). Rather, "[t]o show deliberate indifference, Plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Plinton*, 540 F.3d at 464 (citation omitted). Alternatively, "in a narrow range of circumstances" the "unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick v. Thomas*, 131 S.Ct. at 1361.

38

Here, Marshall has failed to carry his burden in showing a pattern or practice of prior unconstitutional actions that could have put the Defendants City or Dwyer on notice.  The record reflects that Jarrett testified that he was the subject of a "half dozen" citizen complaints but none alleged a constitutional violation.  (Jarrett Dep. at 15).  Meister was apparently also subject to a number of citizen complaints (Ex. 8, Scott Op. at 17-18).  Marshall relies upon his expert's report, wherein the expert concludes that because Meister had received six citizen's complaints and five of those complaints originated from a traffic stop, "it was foreseeable that Officer Meister would be involved in another complaint while engaged in a traffic stop".  (Ex. 8, Scott Op. at 17-18).  At oral argument, Marshall also produced one "official reprimand" of Meister indicating that in October 2004, he had been disciplined by the Farmington Hills Police Department for being "discourteous" to a member of the public by calling him or her a "crappy officer, a liar and a thief".  (Marked Pl.'s Ex. 2).  However, the Court finds this reprimand of limited relevance given it does not indicate that Meister engaged in excessive force or any relevant unconstitutional behavior.  Additionally, the existence of the official reprimand for this behavior indicates on its face that the Defendants City and Dwyer were not "ignoring" a "history of abuse", but rather affirmatively responding to complaints regarding their officer's treatment of members of the public.  Accordingly, Marshall has not evidenced Defendants' "deliberate indifference" which is "a 'stringent standard of fault', for which 'even heightened negligence will not suffice.'" *Plinton*, 540 F.3d at 465 (internal citation omitted).

Finally, Marshall has failed to argue or present any evidence that the situation in which Defendants Meister and Jarrett were presented with – an armed off-duty police officer, pulled over for a traffic violation –  presented such obvious unconstitutional consequences that a failure

to train for such a situation amounted to deliberate indifference.

Accordingly, Marshall's failure to train claim fails as a matter of law.

b. Failure to Supervise

To the extent that Marshall also sets forth a separate claim of failure to supervise, such a claim also fails for the same reasons that Marshall's failure to train claim fails. The Sixth Circuit has recently described a failure to supervise claim:

> 'failure to supervise' theory of municipal liability is a rare one. Most agree that it exists and some allege they have seen it, but few actual specimens have been proved. It appears to relate two more common theories of municipal liability: an inadequate-training theory or an acquiescence theory .... However characterized, [a claim for failure to supervise] must meet the rigorous standards of culpability and causation that the Supreme Court has required when a plaintiff claims that a municipality has indirectly caused a violation of federal rights in spite of its facially lawful policies.

*Amerson v. Waterford Twp.*, 562 F. App'x 484, 491-92 (6th Cir. 2014) (quoting *Mize v. Tedford*, 375 F. App'x 497, 500 (6th Cir. 2010)). Similar to a failure to train theory, a failure to supervise theory requires that the "city acted with 'deliberate indifference' to the risk of [the constitutional violation] and that its deliberate indifference was the 'moving force' behind the assault. *Id.* (citation omitted). In the present case, Marshall has failed to evidence deliberate indifference because he has not come forth with any evidence of a history of abuse or any events that would have put the Defendant City on notice that officer supervision was lacking or inadequate. *See Marcilis v. Twp. of Redford*, 693 F.3d 589, 605 (6th Cir. 2012) (analyzing failure to train and failure to supervise claims together, and finding both claims failed based on a lack of evidence to support "any history of abuse or any events that would have put Redford Township on notice that officer training regarding the use of force or search warrant execution was deficient or likely to cause injury." (citation omitted and internal marks removed)).

40

c. Supervisory Liability Claims (Defendant Dwyer and Unknown Supervisors)

Marshall also appears to be asserting supervisory liability claims (also known as acquiescence claims) against Defendant Dwyer and the Unknown Defendant Supervisors in their individual capacities. Assuming that Marshall could succeed on his underlying constitutional claims against Meister and Jarrett, Marshall's supervisory claims against Dwyer and the Unknown Supervisors would still fail.

The Court notes that such a claim is a separate inquiry from a failure to train or supervise claim against the City or an officer in his official capacity, as examined above. The Sixth Circuit has explained that "where the supervisor is also the policymaker, an individual-capacity claim may appear indistinguishable from an official-capacity or municipal claim, but these failure-to-train [or supervise] claims turn on two different legal principles. For individual liability on a failure-to-train or supervise theory, the defendant supervisor must be found to have 'encouraged the specific incident of misconduct or in some other way directly participated in it.'" *Essex v. Cnty. of Livingston*, 518 F. App'x 351, 355 (6th Cir. 2013) (quoting *Phillips v. Roane*, 534 F.3d 531, 543 (6th Cir. 2008)). Indeed, "[f]or a claimant to succeed on a claim of supervisory liability under § 1983, the claimant must show more than simply a supervisor's right to control employees, and cannot succeed solely on the theory of *respondeat superior*." *Bennett v. City of Eastpointe*, 410 F.3d 810, 818 (6th Cir. 2005) (citing *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)). "At minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Id.* "A mere failure to act will not suffice to establish supervisory liability." *Essex*, 518 F. App'x at 355 (citing *Gregory v. City of Louisville*, 444 F.3d 725, 751

41

(6th Cir. 2006)).  On the other hand, a failure to train or supervise claim lodged against a

municipality is a "broader claim concerning the custom or policy of a municipality."  *Id.*

(citation omitted).

Marshall asserts that Defendant Meister and Jarrett's "supervisors, including Dwyer"

should be found liable based on their role in supervising Defendants Meister and Jarrett who

committed the alleged constitutional violations.  (Am. Compl. ¶¶ 85; Pls.' Resp. at 18).

Marshall's argument in support of this theory is merely that "Meister's and Jarrett's supervisors,

including Dwyer, approved of the officers actions even though the actions violated the

Department's own regulations on use of force."  (Pls.' Resp. at 18).  Marshall does not cite any

specific activity or conduct that would support his arguments, nor does he specify (beyond

Defendant Dwyer) which supervisor "approved" of the actions taken by Meister and Jarrett.[15]

---

[15] During oral argument, Marshall submitted a document entitled "Press Conference,
January 10, 2007, Chief Dwyer's remarks".  (Marked as Pls.' Ex. 1).  Marshall's counsel did not
make any particular arguments regarding its relevance beyond arguing generally that such
remarks harmed Marshall's reputation.  The document provides that Defendant Dwyer stated
during a 2007 press conference that Marshall was "unprofessional" and engaged in "criminal
conduct" that resulted in his "lawful arrest" and also mentioned the child abuse investigation.
The document also reflects that Defendant Dwyer stated: "the manner in which my officer
handled this traffic stop was disappointing" and

> the manner in which this stop was conducted is not in keeping with the high level
> of professionalism expected of Farmington Hills officers.  In addition to basic
> academy training, officers receive additional in-service training on conducting
> traffic stops from both a tactical perspective and that of effectively dealing with
> the public in a courteous and professional manner.  My officer did not perform to
> the level of professionalism expected by me and the Farmington Hills Police
> Department.

(*Id.*).  Finally, Defendant Dwyer's remarks provided that "[t]he conduct displayed by the
stopping officer in this incident is uncharacteristic of his past performance and he has been
relieved of patrol duties pending the outcome of an internal inquiry into his actions."  (*Id.*).  To
the extent that Marshall could rely upon these notes in support of his failure to supervise claim,

Marshall also relies solely upon his expert's opinion that the actions of Meister and Jarrett violated the department's use of force and Dwyer (and other unknown supervisors) approved of the actions.  (*See*, Expert Op. at 7-9).[16]

The Court notes that Marshall has failed to cite to any specific actions by any supervisor that evidence the supervisor "encouraged the specific incident of misconduct or in some other way directly participated in it."  *Phillips*, 534 F.3d at 543.  Rather, Marshall argues in the most general fashion that because the supervisors "approved" of the actions of Meister and Jarrett that liability should lie.  The Sixth Circuit has noted, however, that in order for liability to attach to a defendant supervisor, the plaintiff must show that the supervisor "did more than play a passive role in the alleged violation or showed mere tacit approval of the goings on."  *Bass*, 167 F.3d at 1048 (citation omitted).  Marshall has failed to carry this burden and has failed to specify what supervisors he is referring to or how these supervisors "approved" of Meister and Jarrett's actions.  It bears repeating that when faced with a motion for summary judgment the non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial.  *See* FED. R. CIV. P. 56(e).  Moreover, the Sixth Circuit has "consistently" held that "arguments adverted to in only a perfunctory manner, are waived."

---

the Court finds these comments do not indicate Defendant Dwyer's approval of Meister and Jarrett's actions.

[16] The Court notes that the cited portion of the expert report actually only provides that Meister violated the use of force policy for the reason that Meister was not defending himself or another person, attempting to effect a lawful arrest of a person resisting arrest, or attempting to flee.  (*Id*. at 8).  The report does not address whether Jarrett violated the Farmington Hills Police Department's use of force policy.

43

*Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013); *see also Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005).  Here, Marshall has failed to support his argument with any particular facts or evidence of an evidentiary quality and has failed to identify or differentiate any of the alleged supervisors or their actions.  Accordingly, the Court finds no constitutional violation has been established and that summary judgment on this issue is appropriate.

**B.      State Law Claims**

Marshall also asserts state law claims for Assault and Battery and False Imprisonment in the Amended Complaint.  Marshall also appears to argue in Meister and Jarrett's actions constituted gross negligence. Marshall's wife, Chandra Marshall, asserts a single state law claim for loss of consortium.

1.      Assault, Battery, and False Imprisonment

"Under Michigan law an assault is 'an attempt to commit a battery or an unlawful act which places another in reasonable apprehension of receiving an immediate battery.'" *Grawey v. Drury*, 567 F.3d 202, 315 (6th Cir. 2009) (quoting *People v. Nickens*, 470 Mich. 622, 628 (2004)).  A battery is "an intentional, unconsented and harmful or offensive touching of the person or another, or of something closely connected with the person." *Id.* (citation omitted).

The elements for false imprisonment are "(1) an act committed with the intention of confining another, (2) the act directly or indirectly results in such confinement, and (3) the person confined is conscious of his confinement." *Walsh v. Taylor*, 263 Mich. App. 618, 626-27 (Mich. Ct. App. 2004).  Finally, a plaintiff must also show that the "restraint ... occurred without probable cause to support it." *Id.*

44

In *Odom v. Wayne County*, 482 Mich. 459 (2008), the Michigan Supreme Court explained the proper method for determining whether governmental immunity is applicable to intentional torts under Michigan law, such as assault and battery and false imprisonment, is to use the test set forth in *Ross v. Consumers Power Co.*, 420 Mich. 567 (1984). *See Bletz v. Gribble*, 641 F.3d 743, 757 (6th Cir. 2011). The test in *Ross* provides that "an employee enjoys a right to immunity if (1) the employee undertook the challenged acts during the course of his employment and was acting, or reasonably believed that he was acting, within the scope of his authority; (2) the employee undertook the challenged acts in good faith or without malice; and (3) the acts were discretionary, rather than ministerial, in nature." *Id*. (citing *Odom*, 482 Mich. at 480). Unlike qualified immunity, it is the employee who is seeking governmental immunity who bears the burden in establishing that he or she is immune from the plaintiff's claims. *Id*. (citation omitted).

In the present case, there is no dispute that Meister and Jarrett satisfy the first and third *Ross* factors. Therefore, the only pertinent issue is whether Meister and Jarrett were acting in "good faith or without malice" when they battered him, tased him, and ultimately arrested and imprisoned him. "Unlike qualified immunity under federal law, which uses an objective standard, '[t]he good-faith element of the *Ross* test is subjective in nature. It protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent." *Bletz*, 641 F.3d at 757 (citation omitted). "That malicious intent is defined as 'conduct or a failure to act that was intended to harm the plaintiff ... [or] that shows such indifference to whether harm will result as to be equal to a willingness that harm will result." *Brown v. Lewis*, 779 F.3d 401, 420 (6th Cir. 2015) (citation

45

omitted).

In regards to the use of the taser by Jarrett and physical assault by Meister, the Court finds that the defendants have carried their burden in showing that they are immune to a state law claims of assault and battery.  Here, even taking the facts in a light most favorable to Marshall: there is no dispute that Marshall refused to disarm upon request, had previously grabbed Meister and eventually placed his hand on his weapon when Meister and Jarrett attempted to advance towards him to disarm him.  Given these facts, the Court finds that no jury could conclude Jarrett's single use of the taser and Meister's grabbing or seizing of Marshall evidence that Meister and Jarrett intended to harm Marshall or illustrate indifference as to whether harm would result from their actions.  *See Bletz*, 641 F.3d at 757-58 (finding defendant officer immune to state law battery claim based on shooting the plaintiff when the plaintiff had pointed a gun at the officers and "may have initially ignored Gribble's order to drop his weapon" and the defendant officer claimed he was in fear for his life.).

As to Marshall's claim of false imprisonment, this Court has already examined the issue of probable cause and found that probable caused existed to arrest Marshall for interfering or hindering an officer pursuant to Ordinance 18-31 after Marshall refused to obey repeated verbal commands of the Defendant officers.  Therefore, like Marshall's false arrest claim asserted pursuant to § 1983, Marshall's state law claim for false imprisonment must fail.

2. Gross Negligence

The Court notes as an initial matter, that Marshall did not set forth a separate claim of gross negligence in his Amended Complaint.  To the extent that Marshall is now attempting to assert a separate or alternative claim of "gross negligence" such a claim is denied.  (*See* Pls.'

46

Resp. at 19).  The Sixth Circuit explained in *Bletz* that a plaintiff's allegations of excessive and intentional force could not support a separate claim of gross negligence under Michigan law and "[t]he only cause of action available to plaintiff for allegations of this nature would be for assault and battery."  *Bletz v. Gribble*, 641 F.3d 743, 756 (relying upon *Van Vorous v. Burmeister*, 262 Mich. App. 467, 483 (2004)).  The Sixth Circuit concluded that "[a]lthough establishing that a governmental official's conduct amounts to 'gross negligence' is a prerequisite to avoiding that official's statutory governmental immunity, it is not an independent cause of action."  *Id.*  Here, Marshall's allegations all relate to the "reasonableness or correctness" of defendant's intentional use of force or a taser and are therefore premised on the intentional tort of battery.  *Johnson ex rel. Steward v. Driggett*, no. 306560, 2013 WL 375701, *7 (Mich. Ct. App. Jan. 31, 2013) (citing *Van Vorous*, 262 Mich. App. at 483, rejecting the plaintiff's attempt to "transform claims involving elements of intentional torts into claims of gross negligence.").  Accordingly, Marshall's claim for gross negligence must be dismissed.

3. Loss of Consortium

It is undisputed that Chandra Marshall's claim for loss of consortium is a "derivative" claim and therefore it rises and falls on the ability of Marshall to prevail on his primary claims. *See Kohler v. North Start Steel Co. , Inc*., 408 F. Supp. 2d 380, 386-87 (E.D. Mich. 2005) (citing *Long v. Chelsea Comm. Hosp*., 219 Mich. App. 578 (1996)).  As the Court concludes that none of Marshall's claims survive summary judgment, Chandra Marshall's claim for loss of consortium claim must be similarly dismissed.

47

VI. CONCLUSION

For all these reasons, the Court GRANTS Defendants' Renewed Amended Motion for

Summary Judgment (ECF No. 40).

IT IS SO ORDERED.


s/Paul D. Borman_____
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  October 13, 2015

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or
party of record herein by electronic means or first class U.S. mail on October 13, 2015.


s/Deborah Tofil_____
Case Manager

48